**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMERICAN LUNG ASSOCIATION, et al,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **and** ) | |
| ) | |
| **HEARTH, PATIO & BARBECUE** ) | |
| **ASSOCIATION,** ) | |
| **ATTN: Jack H. Goldman** ) | |
| **1901 North Moore St., Suite 600** ) | |
| **Arlington, VA 22209** ) | **No. 13-cv-01555 (GK)** |
| ) | |
| **Proposed Plaintiff-Intervenor** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **GINA MCCARTHY, in her official capacity as** ) | |
| **Administrator, U.S. Environmental Protection** ) | |
| **Agency,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO INTERVENE AS PLAINTIFF BY
HEARTH, PATIO & BARBECUE ASSOCIATION**

The Hearth, Patio & Barbecue Association ("HPBA," or "Proposed Intervenor") hereby files this statement of points and authorities in support of its motion to intervene as a plaintiff pursuant to Fed. R. Civ. P. 24 and Local Rule 7(j).  As a longstanding and active stakeholder in both historic and continuing efforts related to the development and revision of new source performance standards under Subpart AAA of the Part 60 regulations under the Clean Air Act ("CAA"), HPBA has Article III standing and satisfies the requirements for intervention as a matter of right or, alternatively, for permissive intervention.  HPBA also recently notified the Environmental Protection Agency ("EPA" or "the Agency") of its intent to file its own lawsuit

seeking the same relief as the plaintiffs in this case—*i.e.*, a declaration that EPA has violated its

nondiscretionary duty to complete its review and revision of Subpart AAA by the statutory

deadline, and appropriate injunctive relief to address the violation.  Intervention in this suit

could, however, eliminate the need for a separate lawsuit.  Accordingly, this Court should grant

HPBA's motion to intervene.

## **BACKGROUND**

The plaintiffs in this lawsuit (collectively, "Plaintiffs") seek to compel the EPA to carry

out its statutory duty to review and revise 25-year-old standards for new residential wood

heaters.  To provide the context for HPBA's motion to intervene, we summarize the key issues

and developments below.

I.      **Regulatory and Procedural History**

EPA first began regulating new residential wood heaters under Section 111 of the CAA

in 1988, when it issued its final rule promulgating standards of performance for particulate

matter emissions under Subpart AAA.  *See* Standards of Performance for New Stationary

Sources; New Residential Heaters, 53 Fed. Reg. 5,860 (Feb. 26, 1988).  The regulations

expressly applied to "new residential wood heaters," and excluded other hearth appliances, such

as furnaces, boilers, and fireplaces.  *Id.*  The standards put in place under EPA's 1988 rule

issuance remain in place today.  *See generally* 40 C.F.R. Part 60, Subpart AAA.

HPBA's members are directly regulated by standards for solid fuel burning appliances

such as those under Subpart AAA.  Thus, HPBA has consistently been at the forefront of

advocacy efforts related to the development and revision of hearth appliance standards.  For

example, HPBA's predecessor, the Wood Heating Alliance, played a critical role in the

regulatory negotiation proceedings responsible for Subpart AAA,  the first generation Section

111 standards for wood stoves and some pellet stoves.  *See* Ex. A (Declaration of Robert

Ferguson, ¶ 5 (Oct. 31, 2013)).  Since the outset of recent EPA discussions pertaining to potential revision of Subpart AAA, HPBA has proactively sought to advance industry's interests on the relevant issues, including through its participation on voluntary consensus standard-setting bodies such as ASTM, by collecting industry information and data, by conducing scientific research and analysis, and in advocating for its members on the ultimate standards to be issued. *See* Ex. A (Ferguson Decl. ¶¶ 4-7); *see also* Ex. B (60-Day Notice of Intent to Sue from J. Goldman, Hearth, Patio & Barbecue Ass'n, to Administrator McCarthy, U.S. EPA, at 1-2 (Oct. 10, 2013)).  While EPA's efforts have so far generated a proposed rulemaking package that is currently undergoing review by the Office of Information and Regulatory Affairs ("OIRA") under Executive Order 12866, the process to review and revise the Subpart AAA standards is far from complete.

In light of EPA's inaction, Plaintiffs filed this suit on October 9, 2013.  *See* Compl. for Declaratory and Injunctive Relief [ECF No. 1].  Plaintiffs allege claims under Section 304(a)(2) of the CAA, which permits citizens to bring suit to challenge EPA's failure to perform non-discretionary statutory duties.  42 U.S.C. § 7604(a)(2).  Specifically, Plaintiffs challenge EPA's failure to timely "review and, if appropriate, revise" the existing Subpart AAA standards, pursuant to Section 111(b)(1)(B).  42 U.S.C. § 7411(b)(1)(B).  That provision requires EPA to review and appropriately revise Section 111(b) standards for new sources at least every eight years, unless the Administrator determines "that such review is not appropriate in light of readily available information on the efficacy of such standards."  *Id.*  In Plaintiffs' view, EPA's failure to complete its review and revision of Subpart AAA by the statutory deadline is a violation of EPA's non-discretionary duties under Section 111(b) warranting judicial intervention and relief. *See* Compl. for Declaratory and Injunctive Relief ¶¶ 1, 40-42.

## II.     Unique Implications of Regulatory Process for HPBA

HPBA shares Plaintiffs' view that EPA's failure to timely complete its revisions to

Subpart AAA violates the Agency's statutory duties under Section 111(b).  Indeed, HPBA

recently submitted its own 60-day notice of intent to sue under the Clean Air Act's citizen suit

provision, seeking to enforce EPA's non-discretionary duty to timely review and revise the

existing new source performance standards ("NSPS") for residential wood heaters.  *See*

*generally* Ex. B (HPBA 60-Day Notice).  HPBA's notice of intent to sue discusses a range of

concerns held by industry members as a result of EPA's delay and inaction—concerns which

would be addressed through HPBA's intervention in this suit.  *See id.*

EPA's noncompliance with Clean Air Act Section 111(b) uniquely affects HPBA's

members, who are directly regulated by existing standards and bear the burden of complying

with any future revised and additional standards.  Simply put, EPA's failure to act has had an

industry-wide impact on manufacturers' ability to meaningfully plan to ensure compliance with

revised regulatory requirements, and to do so without incurring additional costs caused by the

uncertainties occasioned by EPA's delay.  *See, e.g.*, Ex. C (Declaration of Bret Watson, ¶¶ 3-6

(Oct. 29, 2013)); Ex. D (Declaration of Frank L. Moore, ¶ 8 (Oct. 31, 2013)); Ex. E (Declaration

of Timothy Seaton, ¶ 10 (Oct. 3, 2013)); Ex. A (Ferguson Decl. ¶ 5).  HPBA's own notice of

intent to sue focuses on this problem, pointing out that EPA's delay has "created significant

uncertainty for manufacturers in designing or modifying their appliance models, which

negatively affects meaningful long-term planning and investment decisions."  Ex. B (HPBA 60-

Day Notice at 2).

EPA's failure to timely review and revise Subpart AAA has also created additional,

unique burdens on hydronic heater manufacturers due to the lack of clear direction from the

federal government in formulating nationally uniform standards.  These concerns were highlighted in a September 2007 letter from HPBA's Outdoor Hydronic Heater Caucus (now called a "Sub-Section") to EPA supporting a new NSPS for hydronic heaters and urging EPA to alleviate the burdens of having to participate in patchwork state and local standard-setting proceedings to fill the void created by the lack of an NSPS.  *See* Ex. B (HPBA 60-Day Notice at 2); *see also* Ex. D (Moore Decl. ¶ 5) (discussing September 2007 letter and the impact of existing state and local regulatory requirements that "could potentially have been avoided if uniform national standards had been in existence").

Masonry heater manufacturers suffer from many of the same burdens as hydronic heater manufacturers.  They also suffer additional unique burdens including, in particular, that their appliances are effectively banned in many areas due to the lack of NSPS coverage.  *See* Ex. B (HPBA 60-Day Notice at 3); Ex. E (Seaton Decl. ¶ 6) ("As the years have gone by, masonry heaters continue to be marched out of one jurisdiction after another based on rules requiring EPA certification."); *see also* Ex. E (Seaton Decl. at Ex. 2) (list of jurisdictions that do not allow or heavily regulate masonry heaters).  To solve these problems, HPBA's Masonry Heater Caucus (also now called a "Sub-Section") has long requested EPA to include them in the NSPS, which we understand that EPA is planning to do.  However, because of EPA's delay masonry heater manufacturers continue to suffer harm.

## <u>ARGUMENT</u>

Federal Rule of Civil Procedure 24 is to be construed liberally: "[A]n applicant to intervene need only show that the representation of his interest may be inadequate; the burden of proof rests on those resisting intervention."  *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1390 (D.C. Cir. 1980).  Rule 24 recognizes two paths to intervention.  Under Rule 24(a), a party is

entitled to intervene as a matter of right if the party "claims an interest relating" to the action and "is so situated that disposing of the action may as a practical matter impair or impede" the party's "ability to protect its interest." Fed. R. Civ. P. 24(a). Alternatively, a party may seek "permissive" intervention under Rule 24(b)(1), if the party has a "claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). For reasons explained below, HPBA has standing and is entitled to intervene under Rule 24(a) and, alternatively, should be permitted to intervene under Rule 24(b).

## I.      HPBA Has Article III Standing To Intervene.

In the D.C. Circuit, a prospective intervenor must demonstrate that it has Article III standing by showing "(1) injury in fact, (2) causation, and (3) redressability." *Fund for Animals, Inc. v. Norton,* 322 F.3d 728, 733 (D.C. Cir. 2003) (citing *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560-61 (1992)). Furthermore, to satisfy requirements for associational standing, a proposed intervenor must also demonstrate that its "members would otherwise have standing to sue in their own right." *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 533 (1996).

HPBA satisfies the test for Article III standing, which is "self-evident" in this case just as it is in "many if not most cases . . . [involving] review of administrative action." *See Fund for Animals*, 322 F.3d at 733. If a party is itself the object of the government action (or, in this case, inaction) at issue, there is "ordinarily little question" that the party may be harmed and that a judgment preventing the action will redress the injury. *Defs. of Wildlife,* 504 U.S. at 561-62.

HPBA's members suffer concrete injury as a direct result of EPA's failure to timely review and revise Subpart AAA. First, EPA's failure to timely revise Subpart AAA has caused all HPBA members to incur costs due to regulatory uncertainty. *See, e.g.*, Ex. C (Watson Decl. ¶ 6); Ex. D (Moore Decl. ¶ 8); Ex. E (Seaton Decl. ¶ 10); Ex. A (Ferguson Decl. ¶ 5). Absent

sufficient clarity as to the nature and timing of likely revisions, HPBA's members, including wood stove manufacturers covered under the existing NSPS, are forced either to delay specific planning and investment, or to act at the risk that their efforts may be redone in light of the requirements that are finally promulgated. *See, e.g.*, Ex. A (Ferguson Decl. ¶ 5) ("Without definitive standards or a clear sense of when [revised residential wood heater] standards will be issued, it is difficult to make planning and research and development decisions and to commit to capital expenditures."); Ex. C (Watson Decl. ¶ 4) ("Jøtul has been essentially treading water with respect to initiating any new woodstove projects because we do not know what EPA's revised standards will look like, when they will be issued, what the compliance timeline will be, etc. Without knowing these important variables, it is hard for Jøtul to make long range planning decisions or capital investments."); *see also* Ex. E (Seaton Decl. ¶ 10) ("[U]ntil EPA issues a rule indicating what standards, rules, and test methods will apply, I am unable to invest in and move forward with new product testing and other projects."). Either way, HPBA's members suffer increased costs. *See, e.g.*, Ex. C (Watson Decl. ¶ 6) (describing "opportunity cost of putting new projects on hold – namely, lost incremental sales/profits and market share gains" and "opportunity cost of delaying cost saving improvements to [Jøtul's] existing line of wood appliances").

Second, appliance manufacturers who have long sought coverage under Subpart AAA continue to face a regulatory miasma of inconsistent state regulations that have been and continue to be issued in the absence of any federal standards governing emissions. *See* Ex. B (HPBA 60-Day Notice at 2-3) (discussing lack of uniformity in state and local hydronic heater standards). HPBA's Hydronic Heater Sub-Section wrote EPA supporting coverage under Subpart AAA six years ago to foster national uniformity in hydronic heater standards, and to

mitigate the costs of participating in recurrent state and local standard-setting proceedings.  *See* Ex. D (Moore Decl. at Attachment A).  However, lacking final action by EPA, hydronic heater manufacturers continue to face an increasing patchwork of non-uniform state and local regulatory requirements ranging from requirements to obtain state-level certification to bans on the use of hydronic heaters.  *See* Ex. D (Moore Decl. ¶ 5).  In fact, just this past September, the state of Alaska proposed new wood heater regulations including, among other things, emissions limitations for hydronic heaters.  *See* Notice, Proposed New Air Quality Regulations – Air Quality Fine Particulate Matter (PM-2.5) – Wood Heating Devices, STATE OF ALASKA, *available at* http://aws.state.ak.us/OnlinePublicNotices/Notices/View.aspx?id=169696 (last visited Oct. 28, 2013); *see also* Ex. D (Moore Decl. ¶ 6) (discussing proposed Alaska regulations, and resulting need to participate in state and local regulatory proceedings).

EPA's delay also precludes the resolution of some of the most contentious issues surrounding hydronic heaters, something which would be achieved through prompt completion of a transparent notice-and-comment process to revise Subpart AAA.  *See*, *e.g.*, Ex. B (HPBA 60-Day Notice at 3); *see also* Ex. D (Moore Decl. ¶ 8) ("Should EPA . . . move forward and establish clear, uniform standards, that will give customers in the marketplace the certainty they need to make purchasing decisions.").  As described in HPBA's notice of intent to sue, prompt EPA action to revise the NSPS "would assist in finally resolving many of the contentious issues surrounding these appliances by providing an opportunity for their resolution in a transparent, rigorous standard-setting proceeding in which all stakeholders can participate."  Ex. B (HPBA 60-Day Notice at 3).

The masonry heater industry faces other related injuries due to EPA's continuing inaction.  *See id.* (HBPA 60-Day Notice at 3).  Despite their inherent clean burning

characteristics, masonry heaters are often perceived as "dirty" because they cannot be EPA-certified.  *See id.*; *see also* Ex. E (Seaton Decl. ¶ 5) ("An unintended result of [masonry heaters' exemption from the NSPS] has been a tendency by state and local jurisdictions to assume that the absence of NSPS coverage means that masonry heaters are not clean-burning, a perception that could not be further from the truth.").  As a result, any authorization for their use or installation has often come at a high cost, under tight restrictions.  *See* Ex. E (Seaton Decl. ¶¶ 6-9).  Many jurisdictions have effectively banned them altogether (*i.e.*, by requiring all appliances to be "EPA-certified").  *See* Ex. B (HPBA 60-Day Notice at 3); Ex. E (Seaton Decl. ¶¶ 6-7 & Ex. 2).  Of course, masonry heaters cannot be EPA-certified unless and until they are incorporated into the NSPS—something which cannot happen until EPA completes the process of revising Subpart AAA.  *See* Ex. B (HPBA 60-Day Notice at 3 ("[U]ntil [masonry heaters are included in the NSPS], the regulatory barriers to masonry heaters in these jurisdictions will remain in place.");  *see also* Ex. E (Seaton Decl. ¶ 12).  Though EPA has clearly indicated its intent to bring masonry heaters within the sweep of a revised Subpart AAA, EPA's delay in promulgating revised regulations forces this already small industry to bear the burdens and costs of complying with a patchwork of state and local standards, which has resulted in a significantly reduced market.  *See* Ex. E (Seaton Decl. ¶¶ 11-12).

All these injuries are sufficiently concrete to satisfy Article III's injury-in-fact requirement.  *See Fund for Animals*, 322 F.3d at 733.  Moreover, they are directly caused by, and thus "fairly traceable" to, EPA's failure to comply with the statute.  *Id.*  Finally, these injuries would be redressed by a favorable ruling from this Court, compelling agency action in performance of EPA's duty to issue revised standards under Subpart AAA.

HPBA also satisfies associational standing requirements, as its members would have standing in their own right, the interests HPBA seeks to protect are germane to its organizational purpose, and neither the claims asserted nor relief requested require the participation of individual members.  *See Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977).  First, because HPBA's membership is composed of manufacturers directly subject to Subpart AAA and any potential revision, its members plainly would have standing, based on the injuries described above.  *See Defs. of Wildlife,* 504 U.S. at 561-62.  Second, HPBA's purposes are germane to the litigation.  "Germaneness is satisfied by a 'mere pertinence' between litigation subject and an organization's purpose."  *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 111 (D.C. Cir. 1990).  Here, one of HPBA's primary purposes is to represent and protect the interests of its members – manufacturers specifically subject to the NSPS regulations at issue in this case – before government regulators responsible for developing and enforcing standards and requirements applicable to their products.  Indeed, as referenced above and detailed in HPBA's notice of intent to sue, HPBA has historically been at the forefront of efforts related to the promulgation and revision of Subpart AAA, from the initial regulatory negotiation proceedings to establish a wood heater NSPS up through the most recent deliberation over review and revision.  *See* Ex. B (HPBA 60-Day Notice at 1-2); *see also* Ex. A (Ferguson Decl. ¶¶ 5-7).  Accordingly, HPBA's representation of regulated industry in this matter is not only germane to but corresponds directly with its organizational purpose.

Finally, neither the claims asserted nor the relief requested requires the participation of individual HPBA members.  No parties to this litigation are seeking monetary damages.  Rather, the remedy at stake in this litigation is a declaratory judgment that EPA has violated a nondiscretionary duty to complete its review and revision of Subpart AAA, and an injunction

compelling EPA performance of this duty.  *See* Compl. for Declaratory and Injunctive Relief ¶¶ 1, (1)-(5); HPBA [Proposed] Compl. for Declaratory and Injunctive Relief ¶¶ 1, A-E.  Because such relief is equitable, individual member participation is not required.  *See United Food & Commercial Workers Union Local 751*, 517 U.S. at 553-54.

## II.     HPBA May Intervene as of Right Under Rule 24(a).

Fed. R. Civ. P. 24(a)(2), which provides for intervention as of right, states, as follows:

> On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

In the D.C. Circuit, an applicant's right to intervene depends upon (1) "the timeliness of the motion; (2) whether the applicant claims an interest relating to the property or transaction which is the subject of the action; (3) whether the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) whether the applicant's interest is adequately represented by existing parties."  *Fund for Animals*, 322 F.3d at 731 (internal quotation marks omitted).  Although the D.C. Circuit requires "a party seeking to intervene as of right [to] demonstrate that it has standing under Article III of the Constitution," *id.* at 731-32, it has also noted that "any person who satisfies Rule 24(a) will also meet Article III's standing requirement."  *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003).

As explained below, HPBA meets the requirements for intervention as of right under Rule 24(a)(2).

A.      **HPBA's Motion to Intervene is Timely.**

HPBA's motion is unquestionably timely.  "[T]imeliness is to be judged in consideration of all the circumstances, especially weighing the factors of time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties in the case."  *See United States v. British Am. Tobacco Australian Servs.*, 437 F.3d 1235, 1238 (D.C. Cir. 2006) (quoting *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1295 (D.C. Cir. 1980)).

This case is still at a preliminary stage.  Plaintiffs filed their complaint on October 9, 2013, and EPA has not yet filed an answer.  A motion to intervene prior to a defendant's answer is timely.  7C CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1916, at 557 (3d ed. 2007) (motion to intervene "made before the existing parties have joined issue in the pleadings has been regarded as clearly timely").  In addition, no preliminary or dispositive motions have been filed, nor have any rulings on the merits been entered or a briefing schedule set.  HPBA's intervention will not prejudice any existing parties or delay the proceedings.  HPBA seeks to "participate in an upcoming . . . phase of the litigation," *Natural Res. Def. Council v. Costle*, 561 F.2d 904, 908 (D.C. Cir. 1977), and not to reopen settled issues that would otherwise remain closed.  Finally, HPBA will comply with all deadlines set forth in any scheduling orders from the Court.

Given the short amount of time since the filing of the Complaint, the significance of HPBA's interests in intervention (discussed below), and the absence of prejudice to any party, this motion "cannot be regarded as untimely."  *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C. Cir. 1998).

**B.      HPBA Has Cognizable Interests That Could Be Impaired By The Disposition Of This Action.**

We discuss the closely related interest and impairment factors together.  The "cognizable interest requirement assists in 'dispos[ing] of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process.'"  *People for the Ethical Treatment of Animals v. Babbitt,* 151 F.R.D. 6, 8 (D.D.C. 1993) ("*PETA*") (quoting *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967)).  HPBA is clearly a "concerned person" because its members are directly regulated by standards imposed by EPA under Subpart AAA and are therefore injured by EPA's failure to timely review and revise those standards.  Moreover, as this lawsuit seeks to challenge EPA's failure to carry out its mandatory responsibilities, the Court's assessment of HPBA's interests must be guided by the even "greater impetus to intervention that inheres in administrative cases" than in ordinary private litigation.  *Nuesse*, 385 F.2d at 700.

In particular, HPBA has strong interests in both (1) avoiding continued regulatory uncertainty, and (2) obtaining NSPS coverage for hydronic heaters and masonry heaters so as to facilitate greater national uniformity, and potentially preclude the burdens and costs of participation in additional state and local proceedings prompted by the absence of federal standards.[1]  As discussed above, EPA's failure to issue any formal proposed or final rulemaking identifying new regulatory requirements to be imposed on industry has created a persistent state of regulatory uncertainty that clouds industry's ability to identify what steps are necessary now

---

[1] While a new NSPS covering hydronic heaters and masonry heaters would not legally preclude the adoption of more stringent state or local standards, *see* 42 U.S.C. § 7416, it could forestall state and local governments from adopting their own standards, particularly in the current resource-constrained environment.

to ensure that its models will be able to comply.[2]  *See supra* Section I.  As a result of such

uncertainty, industry is inhibited from making meaningful long-term plans and is hindered from

making any early investments in new technologies without risking that they will become

unnecessary, or lost entirely as a result of unanticipated regulatory requirements.  *See, e.g.*, Ex. C

(Watson Decl. ¶ 6) (uncertainty due to EPA inaction has required Jøtul "to halt design for

manufacturing and line balancing activities in operations because we simply do not know what

standards we will need to meet (or when) and whether we can modify designs sufficiently to

meet the standards.").

Meanwhile, hydronic heater and masonry heater manufacturers continue to be burdened

by inconsistent and restrictive state and local regulatory requirements brought about in part

because of the lack of clear federal guidance and the unavailability of EPA certification.  *See,*

*e.g.*, Ex. B (HPBA 60-Day Notice at 2-3); Ex. D (Moore Decl. ¶ 5); Ex. E (Seaton Decl. ¶¶ 7-9,

12).  Indeed, the longer that EPA action is delayed, the more labyrinthine the current state-by-

state system of regulation grows, and the more costly and difficult it will be for all industry to

ultimately comply with revised standards.  *See*, *e.g.*, Ex. E (Seaton Decl. ¶ 12); Ex. D (Moore

Decl. ¶¶ 6-7).  Such economic interests plainly make intervention by HPBA in this case

appropriate.  *See Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 135-36

(1967), *vacated on other grounds sub nom.*, *Utah Public Service Comm'n v. El Paso Natural*

*Gas Co.*, 395 U.S. 464 (1969) (economic loss from implementation of a proposed consent decree

---

[2] While EPA has offered preliminary (and fluctuating) positions on various aspects of any revision to Subpart AAA, such informal and premature overtures offer industry no measure of certainty as to what standards might look like and when they will go into effect.  In fact, the anticipated timeline for formal EPA action has already been pushed back on more than one occasion, leaving it unlikely if not impossible that new standards will go into effect any time prior to summer 2015.  Bill Sendelback, *Tough Times for Wood Stoves*, HEARTH & HOME, Sept. 2013, at 90.

warrants intervention).  Indeed, due process and simple fairness demand that HPBA, as regulated

industry, be permitted to assert its inherent interests in the pending litigation.  *See Kleissler v.*

*U.S. Forest Serv.*, 157 F.3d 964, 971 (3d Cir. 1998) (in cases pitting private, state, and federal

interests against each other, "[r]igid rules [barring intervention] contravene a major premise of

intervention – the protection of third parties affected by the pending litigation.  *Evenhandedness*

*is of paramount importance*.") (emphasis added).

As to the potential impairment of HPBA's interests, Rule 24(a)(2) focuses on the

*practical* impairment of the ability to protect one's interests under the particular circumstances of

the case.  The Rule itself expressly provides for intervention of right when "disposing of the

action may *as a practical matter* impair or impede the movant's ability to protect its interest."

Fed. R. Civ. P. 24(a)(2) (emphasis added).  The D.C. Circuit has consistently interpreted this

language as requiring a court to look at the "practical consequences" of denying intervention

when evaluating an intervention request.  *Nuesse*, 385 F.2d at 702; *see also Smuck v. Hobson*,

408 F.2d 175, 180-81 (D.C. Cir. 1969); *Textile Workers Union v. Allendale Co.,* 226 F.2d 765,

767 (D.C. Cir. 1955).  The practical effect of denying HPBA intervention could be continued

regulatory uncertainty and the imposition of additional costs stemming from further EPA delay

in revising its Subpart AAA regulations.  *See, e.g.*, Ex. D (Moore Decl. ¶¶ 6-8); Ex. E (Seaton

Decl. ¶ 12); *see also* Ex. C (Watson Decl. ¶ 6) ("The bottom line is, the continuing delays in

revising the applicable standards are affecting the way we do business.").  Intervention therefore

is appropriate to avoid this result and instead compel prompt government action that will both

enable HPBA's members to make informed steps to comply, and allow for meaningful advocacy

and involvement in the standard-setting process going forward.

**C.      HPBA's Interests Are Not Adequately Represented By the Existing Parties.**

None of the existing parties in this case can adequately represent HPBA's interests.

Proposed intervenors need only show "that representation of [their] interest 'may be' inadequate,

not that representation will in fact be adequate." *Dimond v. District of Columbia*, 792 F.2d 179,

192 (D.C. Cir. 1986) (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)).

This burden in making this demonstration "should be treated as *minimal*." *Fund for Animals,*

*Inc.*, 322 F.3d at 735 (quoting *Trbovich*, 404 U.S. at 538 n. 10) (emphasis added).  For example,

in *Trbovich*, the Supreme Court found that a prospective intervenor met his "minimal" burden of

showing possible inadequate representation of its interests by the government even though the

statute at issue in the case expressly obligated the Secretary of Labor to serve his interests.  *See*

404 U.S. at 538-39.

HPBA easily satisfies this "minimal" requirement.  In this case, HPBA's interests

fundamentally differ from those of the existing Plaintiffs.  Plaintiffs are advocacy groups and

state and local agencies, while HPBA represents manufacturers, distributors and retailers of

hearth products.  *See* Ex. B (HPBA 60-Day Notice at 1).  As such, HPBA and Plaintiffs have

very different concerns, and proposals for any resolution of the litigation are likely to reflect each

HPBA's, Plaintiffs', and Defendant's divergent interests.  For example, the existing Plaintiffs

can be expected to seek a judgment or settlement that would require EPA's rapid promulgation

of broadly-applicable, highly generalized standards, while HPBA might prefer approaches that

better protect HPBA's participation in the standard-setting process, by giving appropriate

recognition to the complexity of the issues and the analysis that is needed to adequately address

them.  In this regard, HPBA and the manufacturers and laboratories that it represents have

unique knowledge of the underlying issues that will inform its approach to an appropriate

resolution of this case, which simply cannot be duplicated by Plaintiffs.  *See*, *e.g.*, Ex. A

16

(Ferguson Decl. ¶ 6) (discussing analyses commissioned by HPBA to evaluate industry data and address a variety of wood heater emission questions). In short, HPBA is able to offer unique perspectives and critical information based on its deep familiarity with the industry and the technical issues and data which have an important bearing on the appropriate resolution of this case. Absent HPBA's participation in this matter, HPBA would be precluded from providing such input, and important information would be unavailable to the parties and to this Court in resolving questions that might arise.

That HPBA and Plaintiffs may share some common objective, *e.g.*, a finding that EPA's delay in revising Subpart AAA is unlawful, is both irrelevant and insufficient. Parties must not be assumed to share the same interests "merely because both entities occupy the same posture in the litigation." *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1256 (10th Cir. 2001). Ultimately, whatever common threads may be found in Plaintiffs' and HPBA's claims, the existing Plaintiffs are inherently unable to adequately represent HPBA's divergent interests and those of its members. Plaintiffs have no duty to protect HPBA's current level of engagement in the NSPS process, and further lack the ability or interest to advance HPBA's interests in the procedures and timelines that will govern the process going forward. Because Plaintiffs are unable to adequately represent HPBA's interests in the litigation, intervention of right is warranted in this case.

## III.  Alternatively, HPBA Should Be Permitted To Intervene Under Rule 24(b).

In the alternative, HPBA should be permitted to intervene in this action. Rule 24(b) permits a party, upon timely motion, to intervene where the movant "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). "In order to litigate a claim on the merits under Rule 24(b), the putative intervenor must ordinarily present: (1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a

claim or defense that has a question of law or fact in common with the main action." *Equal Emp't Opportunity Comm'n v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998) (citation omitted).  In deciding whether to grant permissive intervention, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).

HPBA satisfies the first requirement that it have independent grounds for subject matter jurisdiction.  As explained above, HPBA meets the requirements of Article III standing.  *See supra* Section I.  In addition, HPBA seeks to intervene for the purpose of enforcing EPA's duty to timely review and revise standards under Subpart AAA.  *See* HPBA [Proposed] Compl. for Declaratory and Injunctive Relief ¶ 1.  HPBA is not "ask[ing] the district court to adjudicate an additional claim on the merits."  *Equal Emp't Opportunity Comm'n*, 146 F.3d at 1046. Accordingly, to the extent existing Plaintiffs have subject matter jurisdiction to assert their claims, HPBA likewise has jurisdiction.

Second, as addressed above in the context of intervention of right, permissive intervention by HPBA meets the requirement of timeliness.  *See supra* Section II.A.  Because this case remains at only the preliminary stages of litigation, and no answer has yet been filed, HPBA has timely filed its motion for permissive intervention in this case.  *Id*.

Third, HPBA's defenses to Plaintiffs' claims involve "questions of law and fact" that are common to the original parties.  *See*, *e.g.*, *Sierra Club v. Van Antwerp*, 523 F. Supp. 2d 5, 10 (D.D.C. 2007) (granting permissive intervention in part based on common questions of law and fact).  The factual and legal questions sought to be addressed through HPBA's intervention, *i.e.*, the status and adequacy of EPA's efforts to review and revise the Subpart AAA standards, are the same as those implicated by Plaintiffs' existing claims against EPA.  *Compare* HPBA

18

[Proposed] Compl. for Declaratory and Injunctive Relief ¶¶ 30-32 *with* Compl. for Declaratory and Injunctive Relief ¶¶ 41-42.  Thus, HPBA's participation in the lawsuit raises common issues of both fact and law.

Other factors support permissive intervention by HPBA.  Neither Plaintiffs nor the EPA would be prejudiced by HPBA's intervention in this action, as no dispositive motions have been filed, and HPBA commits to complying fully with the Court's scheduling order.  Additionally, the equities strongly favor granting of intervention in this case, given HPBA's considerable interest in the outcome of the litigation as the trade association representing the industry regulated by the standards at issue.  By intervening in this case, HPBA can maintain the regulated community's voice within EPA's process and scheduling for revision of Subpart AAA, as well as protect the integrity of the ongoing revision process, including HPBA's considerable investments in research and advocacy to date.  *See*, *e.g.*, Ex. A (Ferguson Decl. ¶ 7) (describing HPBA's ongoing advocacy efforts with EPA, state, local, and tribal regulators).  As detailed throughout this memorandum, HPBA's intervention in this lawsuit would allow it to actively assert its claims against EPA for failure to perform its mandatory duty, further its efforts to obtain national uniformity and regulatory certainty on behalf of its members, and mitigate against harm resulting from unforeseen changes to processes on which HPBA has relied in the course of planning and implementing its advocacy efforts.

Furthermore, as discussed above, while both Plaintiffs and HPBA seek to enforce EPA's duty to revise the existing regulations, HPBA's interests may not be adequately represented by those Plaintiffs, who ultimately seek a very different substantive outcome.  *See supra* Section II.C.  Indeed, no party other than HPBA can speak to the full impact of EPA's inaction on

industry, as it is HPBA's members who directly bear the costs of compliance with Subpart AAA, and who bear the additional costs of EPA delay and the resultant regulatory uncertainty.

Finally, intervention of right is not only critical to HPBA but also benefits the litigation on the whole.  HPBA's long-term and significant investments of time and resources into these issues render its intervention beneficial to all the parties and to this Court, as HPBA will be able to contribute factual insights and legal arguments based on its historic on-the-ground involvement with these issues, its ongoing advocacy efforts with EPA and the states, and its direct relationships with appliance manufacturers.  *See* Ex. A (Ferguson Decl. ¶¶ 5-7); *see also* Ex. B (HPBA 60-Day Notice at 1-2).  Accordingly, this Court should exercise its discretion by finding it in the interests of justice to allow HPBA to permissively intervene as plaintiff in this case.

## CONCLUSION

For the reasons stated above, HPBA requests that the Court grant its Motion to Intervene as Plaintiff in this action.

October 31, 2013                              Respectfully submitted,

                                              /s/ David E. Menotti
                                              David E. Menotti (No. 158089)
                                              David Y. Chung (No. 500420)
                                              Dawn Miller (No. 998627)
                                              CROWELL & MORING LLP
                                              1001 Pennsylvania Avenue, N.W.
                                              Washington, DC 20004-2595
                                              (202) 624-2500

                                              *Attorneys for Hearth, Patio & Barbecue Association*